**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **VALERIE A.**, *ex rel.*, L.G., a minor, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 21 C 5257 |
| ) | |
| **KILOLO KIJAKAZI**, Acting ) | Magistrate Judge Finnegan |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Valerie A. seeks to overturn the final decision of the Acting Commissioner of Social Security ("Commissioner" or "Defendant") denying an application she filed on behalf of her minor son, L.G., for Supplemental Security Income ("SSI") child benefits under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the case should be reversed or remanded. The Commissioner responded with a competing motion for summary judgment. After careful review of the record and the parties' respective arguments, the Court grants judgment in favor of the Commissioner.

## BACKGROUND

Plaintiff protectively applied for SSI on L.G.'s behalf on October 31, 2017, alleging disability since August 10, 2012 due to asthma, a speech impairment, learning disabilities, attention deficit hyperactivity disorder ("ADHD"), and sleep apnea. (R. 98, 280, 294, 333). Born in October 2011, L.G. has at all relevant times been a school-age child (age 6 to 12 years old). (R. 280). The Social Security Administration denied the application initially

on January 19, 2018, and again upon reconsideration on December 19, 2018. (R. 64-86). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Lee Lewin (the "ALJ") on December 1, 2020.[1] (R. 28). The ALJ heard testimony from Plaintiff and L.G., both of whom were represented by counsel, and from medical expert Kevin M. Schumacher, Ph.D. (R. 30-63).

On January 11, 2021, the ALJ denied L.G.'s claim for benefits. Following the required three-step analysis, the ALJ found that: (1) L.G. had not engaged in any substantial gainful activity since the October 31, 2017 application date; (2) L.G.'s intellectual disability, communicative/cognitive disability, ADHD, and asthma are severe impairments; but (3) those impairments do not alone or in combination with his non-severe impairments meet, medically equal, or functionally equal any listed impairment. (R. 14-22). As a result, the ALJ concluded that L.G. was not disabled from the October 31, 2017 application date through the date of the decision. (R. 27). The Appeals Council denied Plaintiff's request for review on August 2, 2021. (R. 1-4). That decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of her request for reversal or remand, Plaintiff argues that the ALJ erred in finding that L.G. has a marked and not extreme limitation in acquiring and using information, and a less than marked limitation in attending and completing tasks. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence and there are no errors warranting reversal or remand.

---

[1] The hearing was held telephonically due to the COVID-19 pandemic.

**DISCUSSION**

**A.   Standard of Review**

A child is disabled within the meaning of the Social Security Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). In determining whether a child meets this definition, the ALJ engages in a three-step analysis: (1) if the child is engaged in substantial gainful activity, then his claim is denied; (2) if the child does not suffer from a severe impairment or combination of impairments, then his claim is denied; and (3) if the child's impairments do not meet, medically equal, or functionally equal the severity of a listed impairment, then his claim is denied. 20 C.F.R. § 416.924(b)-(d). *See also McCavitt v. Kijakazi*, 6 F.4th 692, 693 (7th Cir. 2021) (observing that because the disability analysis for children is not work-focused, administrative officials instead ask "whether the child's limitations meet one of the many listed categories of disability or are functionally equivalent to one of them.").

In reviewing an ALJ's decision, the Court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will uphold the ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and build[s] an accurate and logical bridge from the evidence to [the ALJ's] conclusion." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted).

**B.     Analysis**

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in finding that he does not functionally equal any listed impairment. In assessing functional equivalence, the ALJ considers six "domains" of functioning. *Emma H. on behalf of S.H. v. Kijakazi*, No. 20 C 4833, 2023 WL 4665767, at *1 (N.D. Ill. July 20, 2023). The domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). An impairment functionally equals a listing if it results in "marked" limitations in at least two domains of functioning, or an "extreme" limitation in one domain. *McCavitt*, 6 F.4th at 693. A marked limitation "interferes 'seriously' with the child's ability to independently initiate, sustain, or complete activities in the domain, and an 'extreme' limitation interferes 'very seriously.'" *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010). *See also Andrew L. v. Kijakazi*, No. 20 C 1609, 2021 WL 5447035, at *1 (N.D. Ill. Nov. 22, 2021). The functional equivalence analysis requires the ALJ to take a "whole child" approach and "'assess the interactive and cumulative effects of all of the impairments for which we have evidence, including any impairments' which are not severe." *Seth W. o/b/o N.D. v. Kijakazi*, No. 21 C 37, 2023 WL 2646737, at *3 (N.D. Ill. Mar. 27, 2023) (quoting SSR 09-1p, 2009 WL 386031, at *3).

4

1. **Acquiring and Using Information**

The domain of acquiring and using information "refers to how well a child acquires or learns information and how well he uses the information he has learned." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009) (quoting 20 C.F.R. § 416.926a(g)). School-age children between the ages of 6 and 12 (like L.G.) "should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). They should be able to "use these skills in academic situations to demonstrate what [they] have learned," "use these skills in daily living situations at home and in the community," and "use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others." *Id*. "Because most of a . . . school-age child's learning takes place in a school setting, . . . school records are often a significant source of information about limitations in the domain of 'Acquiring and using information.'" *Jones v. Colvin*, No. 16 C 2340, 2017 WL 188139, at *7 (N.D. Ill. Jan. 17, 2017) (quoting SSR 09-3p, 2009 WL 396025, at *3).

In finding that L.G. has a marked limitation in acquiring and using information, the ALJ considered a variety of medical and school records. On September 25, 2018, Timothy J. Sterzik, Psy.D., performed a Psychological Evaluation of L.G. in connection with his application for benefits. At the time, L.G. was 6 years old and in the first grade with no Individualized Education Program ("IEP"). (R. 17, 574). Dr. Sterzik observed that L.G. could not complete simple addition/subtraction problems, identify all coins, or count past 11. (R. 575). Based on his exam, Dr. Sterzik concluded that L.G.'s "[c]ognitive abilities appear to be delayed but it is difficult to be certain to what degree." (R. 17, 576).

L.G.'s language skills were likewise delayed, and he demonstrated "significant difficulties" with mathematics, abstract reasoning, and general knowledge." (*Id.*). Dr. Sterzik assessed unspecified neurodevelopmental disorder; unspecified communication disorder; and educational problems. (*Id.*).

On December 5, 2018, Jason King, Psy.D., conducted a second Psychological Evaluation of L.G. focused on intellectual testing. (R. 17, 577). On the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV) test, L.G. scored 63 in full scale IQ, 65 in processing speed, 67 in perceptual reasoning, 59 in working memory, and 85 in verbal comprehension. (R. 17, 578-79). Dr. King indicated that these scores placed L.G. into the Extremely Low range of intellectual functioning, with areas of significant concern including "overall weakness in cognitive functioning, lack of age appropriate educational/social skills, and limited adaptive functioning in areas such [as] completing age appropriate chores at home and being capable of self-directed behavior at school and at home." (R. 17, 579). Dr. King assessed a mild intellectual disability and ADHD. (*Id.*).

From fall 2018 through spring 2019, L.G. was absent for 25% of the school year (his mother was working and his older siblings did not get him to the school bus on time). (R. 17, 811). Sometime during this period, Diverse Learner Resource Teacher Bridget Carr completed a Teacher Questionnaire.[2] (R. 19, 803). Ms. Carr stated that in the domain of acquiring and using information, L.G. had a very serious problem: understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; expressing ideas in written form;

---

[2] The questionnaire is undated but it appears that Ms. Carr worked with L.G. during the 2018 to 2019 academic year.

6

learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions. L.G. also had a serious problem: comprehending oral instructions. He struggled with learning letter sounds and retaining information, and often needed "1:1 reteaching." (R. 21, 804).

In January and April 2019, L.G.'s teachers referred him for evaluation due to concerns about his academic progress. (R. 17, 835, 837). On the Kaufman Test of Educational Achievement, Third Edition (KTEA-3), L.G. demonstrated "low to very low skills in all areas." (R. 813). His reading, writing, and number sense abilities fell in the 1st percentile or lower, placing L.G. one-half to two grade levels below his peers. (R. 17, 812, 815). In April 2019, L.G. received an IEP with the following classroom accommodations: frequent movement breaks; preferential seating away from distraction and close to instruction; a scribe for extended response (math reading); cues to stay on task; repeated directions; breaking up multi-step directions into smaller steps; and extended time for assignments. (R. 17, 828).

On January 14, 2020, special education teacher A. Winandy completed a Teacher Questionnaire.[3] (R. 19, 359). At the time, L.G. was repeating the first grade due to excessive absences but was working at a kindergarten level. (*Id.*). In the domain of acquiring and using information, Winandy indicated that L.G. had a very serious problem in: reading and comprehending written materials; comprehending and doing math problems; and expressing ideas in written form. He also had a serious problem in: understanding school and content vocabulary; understanding and participating in class discussions; and applying problem-solving skills in class discussions. Winandy stated

---

[3] Winandy's complete first name is unknown.

7

that L.G. could not read or count to 20 and "needs a lot of support in the class." (R. 19, 360).

In March 2020, L.G.'s school prepared an IEP revision report. (R. 18, 1011). School staff noted that absences continued to be a problem affecting L.G.'s academic progress. (R. 18, 1026). He needed "a lot of adult supervision compared to his peers" and received accommodations similar to those provided in the April 2019 IEP. (R. 18, 1012, 1926). The following fall, Winandy completed a second Teacher Questionnaire dated November 18, 2020. L.G. was in the second grade but still working at a kindergarten level. (R. 19, 377). Winandy stated that in the domain of acquiring and using information, L.G. had a very serious problem: reading and comprehending written material; comprehending and doing math problems; understanding and participating in class discussions; and expressing ideas in written form. He also had a serious problem: understanding school and content vocabulary; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions. He remained unable to count past 14 and "needs a lot of support." (R. 378).

In addition to this evidence, the ALJ also considered the opinions of record. On December 18, 2018, state agency consultant Russell Taylor, Ph.D., opined that L.G. has a marked limitation in acquiring and using information. (R. 19, 79). At the December 1, 2020 hearing, Dr. Schumacher testified that based on his review of the entire record, including school and medical notes, L.G. has intellectual and academic delays. (R. 33, 34). Referring specifically to Dr. King's December 5, 2018 consultative exam, the April 2019 IEP evaluation, and the teacher evaluations, Dr. Schumacher opined that L.G. has a marked impairment in acquiring and using information. (R. 34, 36).

8

The ALJ found Dr. Schumacher's opinion persuasive because it was based on a consideration of L.G.'s functioning as a whole and a review of the available school and medical records. (R. 19-20). In addition, Dr. Shumacher provided detailed and thoughtful testimony to explain his reasoning, which was consistent with the evidence overall. (R. 20). *See Stephanie A. v. Kijakazi*, No. 21-CV-775-SPM, 2022 WL 1153464, at *8 (S.D. Ill. Apr. 19, 2022) (quoting SSR 96-6p, 1996 WL 374180, at *2) ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of medical issues in disability claims under the Act."). Notably, Plaintiff does not point to any physician of record who found L.G. to have more than a marked limitation in acquiring and using information. As the Seventh Circuit recently stated, "[t]he lack of an opposing medical opinion [imposing greater restrictions than those the ALJ found in his decision] makes it difficult for us to find that the ALJ misjudged the evidence so significantly as to warrant reversal." *Tutwiler v. Kijakazi*, __ F.4th __, 2023 WL 8461648, at *4 (7th Cir. 2023). *See also Madlock for D.B. v. Kijakazi*, No. 22 C 913, 2023 WL 2631673, at *4 (N.D. Ill. Mar. 24, 2023) ("Plaintiff's request for reversal is fundamentally undermined by the fact that not a single treating, examining, or reviewing medical provider indicated [Plaintiff's] impairments caused greater limitations than those the ALJ assessed.").

Given the ALJ's thorough recitation of the evidence, and the uncontroverted opinion from Dr. Schumacher, Plaintiff nitpicks the decision to find reversible errors. For example, Plaintiff objects that the ALJ only referred to Dr. Schumacher's summary of the intelligence testing conducted by Dr. King, as opposed to the underlying testing itself. (Doc. 14, at 7; Doc. 19, at 2-3) (citing R. 20). This argument fails because the ALJ

9

expressly addressed Dr. King's assessment earlier in the decision, including L.G.'s scores on the WISC-IV. (R. 17). *See Zellweger v. Saul*, 984 F.3d 1251, 1254-55 (7th Cir. 2021) (a reviewing court should read an ALJ's decision holistically).

Plaintiff says the ALJ's discussion was still inadequate because she did not specifically mention Dr. King's finding that L.G. was functioning in the "extremely low" range, or note that he was in the 0.3 percentile for working memory and in the first percentile for processing speed. (Doc. 14, at 7-8; Doc. 19, at 2-3) (citing R. 578-79). Nor did the ALJ explicitly address evidence from the April 2019 IEP that L.G.'s KTEA-3 scores showed "very low" performance in written language composite, written expression, spelling, math composite, and math computation. (Doc. 14, at 8; Doc. 19, at 3-4) (citing R. 840). "An administrative law judge, however, is not required to spell out in the record every piece of evidence that [s]he considered and then accepted or rejected." *Crowell v. Kijakazi*, 72 F.4th 810, 815 (7th Cir. 2023). There is no dispute that the ALJ considered the reports from Dr. King and the April 2019 IEP, and she built a logical bridge from that evidence to her conclusion.

Relatedly, Plaintiff suggests L.G. has an extreme limitation in acquiring and using information based on his low test scores alone. Dr. Schumacher testified that L.G.'s KTEA-3 math composite score of 54 was about three standard deviations below the mean (R. 35), a metric that Plaintiff notes could reflect an extreme limitation. 20 C.F.R. § 416.926a(e)(3)(iii) ("[W]e will find that you have an 'extreme' limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score."). Plaintiff

10

argues that since L.G.'s written language, written expression, spelling, and math computation scores on the KTEA-3 test were lower than his math score, it "stands to reason" that he was three standard deviations below the mean in five academic areas. (Doc. 14, at 8). Plaintiff then speculates that "[h]ad [the ALJ] acknowledged this evidence, she may have determined that an extreme limitation in this domain was warranted." (*Id*. at 8-9).

In making this argument, Plaintiff ignores the fact that Dr. Schumacher reviewed all of L.G.'s test scores collectively, and testified that the WISC-IV scores, Universal Non-Verbal Intelligence Test scores, and KTEA-3 reading scores were only "about two standard deviations below average." (R. 34-35). *See* 20 C.F.R. § 416.026a(e)(2)(iii) (a child may have a marked limitation where valid testing scores are two standard deviations below the mean). Moreover, test scores alone are insufficient to establish the existence of a "marked" or "extreme" limitation in a domain. 20 C.F.R. § 416.926a(e)(4)(i), (ii) ("We will consider your test scores *together with the other information we have about your functioning*, including reports of classroom performance and the observations of school personnel and others.") (emphasis added). Here, Dr. Schumacher determined that L.G.'s scores did not, in conjunction with all of the other evidence of record, support more than a marked limitation in acquiring and using information. Plaintiff may disagree with this assessment, but the Court will not reweigh the evidence to find L.G. more restricted than any physician of record. *Tutwiler*, 2023 WL 8461648, at *4. *See also Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020) (the court "will not reweigh evidence or substitute [its] judgment for the ALJ's."); *Tina W. v. Kijakazi*, No. 20 C 6311, 2023 WL 4053818, at *7 (N.D. Ill. June 16, 2023) (declining the plaintiff's invitation to reweigh the evidence).

11

The ALJ likewise committed no error in evaluating the teacher questionnaires and the findings from Dr. Sterzik. Plaintiff argues that she cannot determine whether the ALJ properly considered and weighed this evidence because she failed to cite every one of the areas where L.G. had a serious or very serious problem, and did not mention every observation from Dr. Sterzik's report. (Doc. 14, at 9-11; Doc. 19, at 4-6). But such level of comprehensiveness is not required. *Crowell*, 72 F.4th at 815. The ALJ explicitly discussed the questionnaires and the medical assessment from Dr. Sterzik (R. 17-19), and reasonably relied on the uncontradicted opinion from Dr. Shumacher that, when viewed with the record as a whole, the evidence supports a finding that L.G. has a marked limitation in acquiring and using information. *Compare Oliver on behalf of D.O. v. Kijakazi*, No. 20 C 4982, 2021 WL 5299788, at *5 (N.D. Ill. Nov. 15, 2021) (in case without medical expert testimony, ALJ's perfunctory analysis of teacher questionnaires required remand); *Davis ex rel. A.L. v. Berryhill*, No. 17 C 2190, 2018 WL 3463280, at *5-6 (N.D. Ill. July 18, 2018) (in case without medical expert testimony, the ALJ's summary of teacher questionnaires was insufficient to explain how she determined the child's functioning in each domain).

Finally, there is no merit to Plaintiff's assertion that the ALJ failed to adequately consider the educational supports L.G. received through his IEP. (Doc. 14, at 10). The ALJ noted that starting in April 2019, L.G. spent 75% of his time outside the general education setting and received speech therapy. (R. 17, 908). The ALJ also acknowledged that L.G. "required a lot of support in the classroom and in the speech setting due to significant foundational gaps," and liked to participate in small groups "due to the support he received." (R. 18). Once again, this Court will not reweigh the evidence

12

to find L.G. more restricted than any physician of record. *Zoch*, 981 F.3d at 602; *Tina W.*, 2023 WL 4053818, at *7.

Viewing the record as a whole, the ALJ did not err in concluding that L.G. has a marked limitation in the domain of acquiring and using information. "Substantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. The ALJ met that standard here, building "an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (internal quotations omitted). Plaintiff's request to remand the case for further consideration of this domain is denied.

### 2. Attending and Completing Tasks

Plaintiff argues that the ALJ committed another reversible error by failing to find L.G. markedly limited in the domain of attending and completing tasks. This domain considers "how well the child is able to focus and maintain his attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes them." *Hopgood ex rel. L.G.*, 578 F.3d at 700-01 (quoting 20 C.F.R. § 416.926a(h)). A school-age child like L.G. should be able to: "focus your attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments"; "concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments)"; and "stay on task and in place when appropriate." 20 C.F.R. § 416.926a(h)(2)(iv).

13

In finding that L.G. has a less than marked limitation in this domain, the ALJ once again discussed the school and medical records and relied on Dr. Taylor's opinion and the uncontroverted testimony from Dr. Schumacher. (R. 17-21). *Tutwiler*, 2023 WL 8461648, at *4; *Madlock for D.B.*, 2023 WL 2631673, at *4. The ALJ acknowledged that L.G. has a serious problem carrying out tasks and needs "one to one re-teaching and adult supervision to complete grade level activities." (R. 21). But the ALJ also accepted Dr. Schumacher's opinion that L.G.'s problems with focus stem from his intellectual disability and largely manifest when he tries to do multi-step school work. (R. 21, 36). (*See also* R. 361) (1/14/2020 questionnaire from teacher Winandy stating that L.G. "can do tasks that are simple."). As Plaintiff herself testified, though L.G. struggles to complete homework, he has no problem playing video games and can complete chores with prompting. (R. 21, 48-49).

Plaintiff argues that the ALJ made a mistake of fact when she stated that "there is no evidence of inability to sit still or behavioral concerns related to problems with attention or completing tasks." (R. 21). The Court agrees that the ALJ's phrasing was inaccurate, as the record contains evidence indicating that L.G. struggled with attention. But the ALJ conceded the point elsewhere in the decision. *Zellweger*, 984 F.3d at 1254-55. For example, the ALJ noted that: during the September 25, 2018 evaluation with Dr. Sterzik, L.G. exhibited deficits in sustained mental effort and concentration, and Dr. Sterzik diagnosed an unspecified disruptive, impulse control, and conduct disorder (based on Plaintiff's reports of home behaviors) (R. 17, 575); L.G. at times appeared hyperactive during Dr. King's December 5, 2018 evaluation and "was looking around the room during instruction and requiring instructions repeated to him" (R. 17, 577); school records from

14

April 2019 indicated that L.G. lacked attention and had problems focusing in class (R. 17, 811, 838); in February 2020, psychiatrist Shuja Uddin, M.D., from Streamwood Behavioral Healthcare System ("Streamwood") reported that L.G. "possibly had some impulsivity" (R. 18, 1008); and teachers Carr and Winandy both reported that L.G. had problems maintaining attention and concentration and focusing on tasks, could only do simple tasks, and needed adult supervision to do grade level work. (R. 19, 361, 379, 805). In such circumstances, the ALJ's misstatement does not constitute reversible error. *Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) (quoting *Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021)) ("We have repeatedly emphasized that 'the harmless error standard applies to judicial review of administrative decisions, and we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.'").

Plaintiff insists that reversal is nonetheless warranted because the ALJ failed to explicitly mention other findings from these records. (Doc. 14, at 12-13; Doc. 19, at 6-7). In particular, the ALJ did not note Dr. Sterzik's observation that L.G. often put his fingers in his mouth and needed redirection to focus on tasks (R. 575), and said nothing about a notation in the April 2019 IEP that during one structured 15-minute observation where L.G.'s behavior was recorded every 15 seconds, he was off task 97% of the time because he was gazing off or had his head on his desk. (R. 838). And in her discussion of Plaintiff's February 2020 outpatient intake assessment at Streamwood, the ALJ failed to cite a checklist indicating that L.G. was distractible, impulsive, and restless with distracted thought processes. (R. 18, 1005). Though the ALJ's decision does not address every single piece of evidence in every document, such exacting detail is not required. *Crowell*,

15

72 F.4th at 815. It is clear that the ALJ considered all of the pertinent records in reaching her decision, and in no way disregarded "an entire line of evidence that supported a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021). *Compare Lopez ex rel. Lopez*, 336 F.3d at 540 (reversing where the ALJ "actually *ignored* the available evidence [of the plaintiff's right-hand impairment] and failed to explain his conclusion.") (emphasis in original).

Plaintiff next argues that the ALJ erred in accepting Dr. Shumacher's testimony that L.G. never received any formal treatment for his ADHD. (R. 21, 34, 36). Plaintiff stresses that L.G. had two evaluations at Streamwood in February 2020 (one as part of an intake and another with Dr. Uddin), and posits that this alone constitutes formal treatment. (Doc. 14, at 13; Doc. 19, at 7). To begin, Plaintiff does not dispute Dr. Shumacher's testimony that L.G. never took any medication for ADHD (Dr. Uddin deemed it unnecessary), and did not participate in individual or group therapy. (R. 18, 21, 1008). Regardless of the reasons why L.G. did not receive such interventions, even without them he did not exhibit typical markers of ADHD. Dr. Shumacher explained that L.G.'s symptoms were not pervasive across environments, he did not require any behavioral management plans, and he was never excluded from class or social activities for "behavioral excesses." (R. 18, 21, 37, 41). In her hearing testimony, Plaintiff agreed that L.G. was never taken out of class or sent to the principal's office for misbehavior. (R. 18, 47-48, 51). To the extent L.G. acted out at home, Dr. Shumacher testified that the described behavior (e.g., needing reminders to pick up his room and do his homework, failing to complete tasks until prompted a couple of times) was typical of all pre-adolescent children. (R. 18, 38, 48-50). Plaintiff points to no contrary opinion in the record.

As for Plaintiff's assertion that L.G. did in fact have difficulty attending and completing tasks across settings, this argument fails as well. In support, Plaintiff stresses: her own report to Dr. Sterzik that L.G. was hyperactive at school, interrupted others, and had problems following directions (R. 574); observations from Drs. Sterzik and King that L.G. needed redirection to focus on tasks (R. 575, 577); and her own statement on the intake form at Streamwood that L.G. is hyperactive, has frequent tantrums, plays rough, and becomes frustrated easily (R. 995). (Doc. 14, at 13, 15). Plaintiff also cites a treatment note from September 2, 2016 stating that L.G. was hyperactive, not listening, and "doing mischief – on wall, with instruments, lot(s) of baby talk to draw attention." (*Id.*) (citing R. 672). Once again, Plaintiff is simply asking the Court to reweigh the evidence to reach a different outcome, something the Court will not do. *Zoch*, 981 F.3d at 602; *Tina W.*, 2023 WL 4053818, at *7. As discussed, the ALJ appropriately considered all of the evidence of record and reasonably relied on Dr. Shumacher's uncontradicted opinion that L.G. has a less than marked limitation in the domain of attending and completing tasks. *Tutwiler*, 2023 WL 8461648, at *4; *Madlock for D.B.*, 2023 WL 2631673, at *4; *Linda T. v. Saul*, No. 19 C 3950, 2020 WL 5210846, at *4 (N.D. Ill. Sept. 1, 2020) (internal citations and quotations omitted) (the Court is "not free to replace the ALJ's estimate of the medical evidence with its own.").

Plaintiff finally objects to the ALJ's reliance on a Function Report she completed on November 17, 2017, indicating that she was not sure whether L.G. was limited in his ability to pay attention and stick with a task, but that he could keep busy on his own, finish things he started, work on arts and crafts projects, and complete chores most of the time. (R. 21, 308). Plaintiff notes that she made these observations before L.G. was formally

17

evaluated by teachers and psychologists, and claims the ALJ did not consider the Function Report in conjunction with other evidence. (Doc. 14, at 15-16; Doc. 19, at 8). That is simply incorrect. The ALJ's analysis was not limited to the single Function Report, but included a review of all of the teacher questionnaires, medical assessments, hearing testimony, and uncontroverted opinion evidence. This was entirely proper. *See Christal R. v. Kijakazi*, No. 2:22-CV-253, 2023 WL 3916016, at *4 (N.D. Ind. June 9, 2023) (no error where function report "was not the only evidence the ALJ relied on in discussing Plaintiff's mental health limitations.").

Also unavailing is Plaintiff's suggestion that the ALJ erred by ignoring her statement in the Function Report that L.G. "tends to only show interest in things that he is interested in." (R. 308). Plaintiff speculates that L.G.'s ability to play video games may indicate that he suffers from "hyperfocus" as a result of his ADHD. (Doc. 14, at 16) (citing SSR 09-4p) ("Some children with impairments . . . may exhibit 'hyperfocus,' an intense focus on things that interest them, such as video games, but be limited in their ability to focus on other tasks."). But neither Dr. Schumacher nor any physician of record opined that L.G. exhibits hyperfocus, much less that it reflects a marked limitation in this domain of functioning. *Tutwiler*, 2023 WL 8461648, at *4.

Viewing the record as a whole, the ALJ built an accurate and logical bridge from the evidence to her conclusion that L.G. has a less than marked limitation in attending and completing tasks. The case will not be remanded for further consideration of this domain.

## **CONCLUSION**

For the reasons stated above, Plaintiff's request to remand the case is denied, and the Commissioner's Motion for Summary Judgment [15] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: December 15, 2023

_____
SHEILA FINNEGAN
United States Magistrate Judge